United States District Court
Middle District of Florida
Tampa Division

DONATA ROMELLE CHESTANG,

    *Plaintiff,*

v.                              NO. 8:23-cv-2196-CEH-PDB

COMMISSIONER OF SOCIAL SECURITY,

    *Defendant.*

_____

# Report and Recommendation

Donata Romelle Chestang challenges a final decision by the Commissioner of Social Security denying her application for disability insurance benefits. Doc. 1. The final decision is a decision by an Administrative Law Judge (ALJ). Tr. 7–28. With the Commissioner's filing of a 1,048-page transcript, Docs. 9, 9-1, 9-2; and the parties' filing of briefs, Docs. 10, 13, 14; the action is ripe for review. Chestang argues that the ALJ reversibly erred by failing to account for the "total limiting effects" of her mental impairments. Doc. 10 at 4–17.

## Administrative Record

Chestang applied for disability insurance benefits on April 16, 2021, alleging she had become disabled on July 30, 2018. Tr. 73, 214–20. Her date

last insured was September 30, 2022.[1] Tr. 22. In a "Pain Questionnaire," she stated that, because of pain, she is "unable to focus or concentrate which is depressing and frustrating." Tr. 284. In a "Function Report" she stated that she has extreme fatigue and constant pain in her back and neck, Tr. 286, which makes everything, including cooking and housework, take longer to complete, Tr. 288. She stated that chronic pain makes her irritable. Tr. 290. She stated that socially "[e]verything has changed due to chronic pain [and] fatigue." Tr. 290. She stated that pain and fatigue affect her ability to remember, complete tasks, concentrate, understand, and follow instructions. Tr. 291. She stated that she reads instructions several times and requires that verbal instructions be repeated several times before she can comprehend what is being said. Tr. 291. She stated that she handles stress poorly, explaining, "I'm jumpy or anxious and sometimes very irritable depending on the pain." Tr. 292.

Chestang's application was denied at the initial and reconsideration levels.[2] Tr. 74–102. She requested a hearing before an ALJ. Tr. 136–37. The

---

[1]For disability insurance benefits, a claimant must show disability by the date last insured. 42 U.S.C. §§ 416(i)(3), 423(a), (c); 20 C.F.R. §§ 404.101, 404.130, 404.131.

[2]The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. 20 C.F.R. § 404.900. Typically, a state agency acting under the Commissioner's authority makes an initial determination. *Id*. at §§ 404.900, 404.1503(a), (b). If dissatisfied with the initial determination, the claimant may ask for reconsideration. *Id*. at § 404.907. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an ALJ. *Id*. at §§ 404.929, 404.930. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. *Id*. at § 404.967. If the Appeals Council denies review, the claimant may file an action in federal court. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

ALJ conducted a hearing, at which Chestang—represented by counsel—and a vocational expert testified. Tr. 36–54.

Chestang testified as follows. She suffers chronic pain. Tr. 40. She has about three good days a week. Tr. 42. On a bad day, her pain is eight out of ten, she has throbbing headaches and stabbing neck and back pain, she can maintain activity for only about five to ten minutes, and if she pushes herself too much, she will continue to feel it "for a couple of days." Tr. 42–43. On a bad day, she cannot physically make it to a doctor's appointment. Tr. 43. Her mental health suffers because of her chronic pain and physical disabilities. Tr. 45–47. She gets "a brain fog," during which she will be listening but will take longer to process and digest information. Tr. 45. She has anxiety and depression tied to her chronic pain. Tr. 47. Her ability to do chores is limited, and she relies on others to help clean the house. Tr. 47–48. Her symptoms affect her sleep. Tr. 48–49.

The vocational expert testified as follows. Chestang previously worked as a customer service representative, a hospital insurance representative, and a secretary. Tr. 50. When asked by the ALJ if an individual who "is able to … lift and/or carry 20 pounds occasionally, and up to ten pounds frequently, sit for six hours, stand and/or walk for six hours, climb ramps and stairs occasionally, never climb ladders, ropes or scaffolds, stoop, kneel, crouch, crawl occasional, never work at unprotected heights or with moving mechanical parts, and [who] must avoid hazards in the workplace such as heavy moving machinery, heights, those types of things" would be able to perform Chestang's past work, the vocational expert responded, "Yes … All three occupations could be performed" with the described limitations. Tr. 50–51. When asked if an

3

individual with added mental limitations such as being "able to perform simple routine tasks, make simple work-related decisions, interact with supervisors, co-workers and the public frequent, and able to tolerate changes in a simple work setting" would be able to perform Chestang's past work, the vocational expert responded, "No … past work could not be performed, it all exceeds simple and routine." Tr. 51.

When asked by the ALJ if an individual who "is able to … lift and/or carry ten pounds occasionally and up to ten pounds frequently, sit for six hours, stand and/or walk for two hours, climb ramps and stairs occasionally, never climb ladders, ropes or scaffolds, stoop, kneel, crouch, crawl occasional, never work at unprotected heights or with moving mechanical parts, and [who] must avoid hazards in the workplace, such as heavy moving machinery, heights, those types of things" would be able to perform Chestang's past work, the vocational expert responded, "Yes … The secretary job can be performed, and the hospital insurance representative … could be performed." Tr. 51–52. When asked if an individual with the added mental limitations previously stated would be able to perform Chestang's past work, the vocational expert again responded no. Tr. 52.

When asked by the ALJ if an individual who is "off task during the day, in that they need additional time to complete their job task, so if the job generally … takes an hour to perform, it'll take the individual … between an hour and a half to two to complete the same job task" would be able to perform Chestang's past work, the vocational expert responded, "No … that limitation is going to preclude past work." Tr. 52.

When asked by Chestang's counsel what is the "bottom-line employer tolerance for … being off-task outside of regularly scheduled breaks" or "for outright being absent or late or having to leave early from work," the vocational expert responded, "The benchmark for off-task is 10% and that's to retain competitive employment. At 11% or greater that would rule out work. The … benchmark for absenteeism is one time per month, greater than that precludes all work." Tr. 53.

After the ALJ issued the decision under review, Tr. 7–28, Chestang requested review by the Appeals Council, and the Appeals Council denied review, Tr. 1–6.

In the decision, issued on April 28, 2023, the ALJ used the five-step sequential process, reviewing the period from July 30, 2018 (the alleged onset date), to September 30, 2022 (the date last insured), and stopping at step four.[3] Tr. 7–28.

At step one, the ALJ found Chestang had not engaged in substantial gainful activity. Tr. 12.

---

[3]The Social Security Administration uses a five-step sequential process to decide if a claimant is disabled, asking (1) whether she is engaged in substantial gainful activity; (2) whether she has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1; (4) whether she can perform any of her past relevant work considering her residual functional capacity (RFC); and (5) whether a significant number of jobs exist in the national economy that she can perform considering her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). If the Social Security Administration finds disability or no disability at a step, it will "not go on to the next step." *Id*. § 404.1520(a)(4).

At step two, the ALJ found Chestang had suffered from severe impairments of "skeletal spine disorders; diffuse connective tissue disease; inflammatory arthritis; and fibromyalgia." Tr. 12. The ALJ found Chestang's obesity non-severe. Tr. 13. The ALJ explained:

> Dr. [Stephen] Christensen performed a consultative evaluation on [Chestang] in August of 2022. [She] was 5'1" tall, and she weighed 165 pounds. [She] demonstrated grossly intact neurological functions, a steady and unassisted gait, full muscle strength, intact sensations throughout, negative straight leg raises, intact reflexes, intact fine motor skills, and normal ranges of motions. [She] was able to open doors, button shirts, manipulate a coin, squat, rise from a seated position, get onto and off the exam table, walk on her heels and toes, do a tandem walk, and hop and stand on one foot (see pages 4-10 of Exhibit C28F).

Tr. 13.

The ALJ likewise found non-severe Chestang's depressive and anxiety disorders, "considered singly and in combination." Tr. 13. Reviewing the four broad functional areas known as the "paragraph B criteria," the ALJ found Chestang has a mild impairment in understanding, remembering, or applying information; in interacting with others; in concentrating, persisting, or maintaining pace; and in adapting or managing oneself.[4] Tr. 13–14. The ALJ

---

[4]The regulations provide a "special technique" for evaluating mental impairments. 20 C.F.R. § 404.1520a. If the claimant has a medically determinable mental impairment, the ALJ rates the degree of the claimant's limitation in four broad functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id*. § 404.1520a(b), (c)(3), (d). The areas comprise the "paragraph B" criteria used in evaluating mental disorders under the Listing of Impairments. *See id*. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b), (E). The "paragraph B" ratings are not an assessment of the claimant's RFC; they are used to rate the severity of the claimant's mental impairments at steps two and three. *Id*. §§ 404.1520(a)(2)–(3), 404.1520a(d)(1), (d)(2).

based these findings on (1) Chestang's ability to read; (2) Chestang's testimony that she can cook small meals, perform light chores ("albeit at a pace") even on a "not-so-good day," and do normal things; (3) the absence of testimony that Chestang does not get along with others; (4) September 2021 and June 2022 adult function reports showing Chestang can use a computer; communicate with others; count change; read, understand, and answer the report questions; attend church; get along with others; get along with authority figures; watch television daily; finish what she starts occasionally; care for a cat; dress herself ("albeit a little slowly"); bathe herself ("while sitting or holding onto something"); feed herself; maintain her basic and daily grooming; and handle changes in routine okay; (5) a March 2020 consultative examination by Dr. Brian Higdon showing Chestang exhibited fluent speech, clear thought processes, normal memory, good concentration, an ability to perform more demanding tasks, and good eye contact; (6) Dr. Christensen's August 2022 consultative examination showing Chestang had unremarkable speech, adequate receptive language, adequate social skills, adequate judgment, coherent and logical thoughts, adequate immediate and recent memory, appropriate thought form and content, average intelligence, goal-directed thoughts; alertness; and adequate attention and concentration; and (7) an August 2022 consultative examination by Alexandra Binney, Ph.D., showing Chestang had fluent speech, good eye contact, clear thought processes, alertness, good concentration, and normal memory. Tr. 13–14.

At step three, the ALJ found Chestang had had no impairment or combination of impairments that met or medically equaled the severity of one

of the listed impairments.[5] Tr. 14. The ALJ specifically considered listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), 1.18 (abnormality of a major joint or joints in any extremity), and 1.19 (pathological fractures due to any cause). Tr. 15. The ALJ explained the record contained no evidence showing Chestang had not been able to "perform fine and gross movements with at least one upper extremity due to a combination of extremity-related limitations and the use of a medically necessary mobility device"; "systemic lupus erythematosus that has involvement of two or more organs/body systems, or repeated manifestations and limitation functioning"; or "major dysfunction of any joint, or signs of inflammation or deformity in two or more joints, resulting in an inability to ambulate effectively or an inability to perform fine and gross movements effectively." Tr. 15. For these findings and her consideration of Chestang's fibromyalgia, the ALJ relied on the report from Dr. Christensen's August 2022 consultative evaluation. Tr. 15–16.

The ALJ found Chestang had possessed the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can lift twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour workday; and stand or walk or both for two hours in an eight-hour workday; but could never climb ladders, ropes, and scaffolds; could never work at unprotected heights; could never work around moving mechanical parts, or other workplace hazards like moving or heavy machinery; and could

---

[5]The Listing of Impairments "describes for each of the major body systems impairments [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a).

only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. Tr. 16.

> The ALJ summarized Chestang's testimony:
>
> [Chestang] testified she suffers from constant chronic pains in her back, knees, and neck. [She] also indicated she has depression, anxiety, brain fog, sleep problems, and confusion. She rates her pain as an eight when she wakes up in the mornings. [She] described the pain as throbbing. She reported she remains in bed most of the day, and that she cannot attend social events due to her physical issues. [She] insisted her pain medication dosages have increased, and that the medications cause weight gain. She also asserted it takes her longer to process conversation. According to [Chestang], her husband shops for groceries, and she hires out housecleaning. However, [she] admitted she is able to do normal things, to perform light chores (albeit at a pace) even on a not-so-good day, and to cook small meals. In her adult function reports dated September of 2021and June of 2022, [she] noted she was able to care for the cat, dress herself (albeit a little slowly), bathe herself (while sitting or holding onto to something), feed herself, maintain her basic and daily grooming, use a computer, watch television daily, communicate with others, attend church, get along with others, finish what she starts occasionally, get along with authority figures, handle changes in routine okay, and/or count change. The undersigned notes [she] was adequately able to read, understand, and answer the questions in both adult function reports (Exhibits C4E and C11E).

Tr. 16–17.

The ALJ found Chestang's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but further found her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 17. The ALJ explained, "As for [Chestang]'s statements about the intensity, persistence, and limiting effects of … her

symptoms, they are inconsistent because the medical evidence established [she] was able to function even with her impairments." Tr. 17.

The ALJ summarized the medical evidence:

In March of 2019, lumbar spine films showed moderate L5-S1 endplate remodeling and disc narrowing, with normal vertebral body height and anatomic alignment, and with no signs of acute fracture, significant bony foraminal stenosis, compression deformities, malalignment, or instability (see page 20 of Exhibit C5F). Cervical spine x-rays revealed mild findings, with normal curvature, normal vertebral body height, normal soft tissues, and anatomic alignment (see page 22 of Exhibit C5F). Thoracic spine radiographs were negative (see page 24 of Exhibit C5F). In August of 2019, radiographs were taken of [Chestang]'s pelvis and hip. The films were negative for acute fracture, and significant abnormality. The test also showed preserved joint spaces (see page 16 of Exhibit C5F). Sacroiliac joint x-rays did not indicate any acute fracture, significant abnormality, joint space narrowing or ankylosis, periarticular erosion, or soft tissue swelling. The sacroiliac joints were well-aligned (see page 18 of Exhibit C5F).

In March of 2020, Dr. … Higdon performed a consultative exam on [Chestang]. [She] alleged FM (see page 2 of Exhibit C7F). [She] exhibited full muscle and grip strength, intact sensations, negative straight leg raises, a steady and unassisted gait, and normal ranges of motions. [She] was able to lift/carry/handle light objects, to perform fine motor skills rise from a seated position, to get onto and off the exam table, to walk on her heels and toes, to perform a tandem walk, and to hop and stand on one foot (see pages 3-5 of Exhibit C7F). Dr. Higdon also observed [she] possessed alertness, good eye contact, fluent speech, clear thought processes, normal memory, good concentration, and an ability to perform more demanding tasks (see page 4 of Exhibit C7F).

[Chestang] sought treatment at Bay Area Arthritis and Osteoporosis, from August of 2019 to September of 2021, for multiple joint pains, osteopenia, and connective tissue disease. In July of 2021, [she] stated she was told her lupus was in remission (see page 2 of Exhibit C18F). Evaluations demonstrated alertness, intact orientation, a cooperative attitude, good judgment and insight, normal ranges of motions, a normal unassisted gait, and normal extremity strength (e.g., see pages 2, 7, and

10

11-12 of Exhibit C9F; pages 2, 10, and 19 of Exhibit C15F). In October of 2021, [she] went to Southside Cardiovascular Associates. It was observed [she] had clear lungs, a regular heart rate and rhythm, normal ranges of musculoskeletal motions, normal strength, and an appropriate mood and affect (see page 8 of Exhibit C21F).

Dr. Neil Weisman treated [Chestang] from February of 2019 to January of 2022, for low back pain, thoracic and lumbosacral spondylosis and lower back spasm. In October of 2019, [she] was satisfied with the level of benefit she received from interventional treatments (see page 26 of Exhibit C8F). In September of 2019 and in February of 2020, [she] reported 80% symptom improvement with radiofrequency and good symptom improvement with nerve block injection (see pages 13, 22, and 29 of Exhibit C8F). In January/March of 2020, in June/August/September of 2021, and in January of 2022, [she] stated she obtained 80%- 100% improvement in pain and function with medical branch nerve block injection, and greater than 50% benefit from analgesic (see page 10 of Exhibit C8F; pages 7, 12, and 19 of Exhibit C19F; page 8 of Exhibit C22F; and page 1 of Exhibit C23F). Longitudinal records of exams revealed a healthy appearance, normal ambulation and gait, a normal mood and affect, normal motor bulk and tone, a normal station, and grossly intact sensations (e.g., see pages 9, 16, 21, 25, 32, 67, and 72 of Exhibit C8F; pages 10, 15, and 22 of Exhibit C19F; and page 10 of Exhibit C22F). Of note, in January of 2022, x-rays of [her] right hand, wrists, knees, left ankle, and right ankle showed normal wrists and right hand, mild knee and left ankle osteoarthritis, and a normal right ankle (see page 18 of Exhibit C24F; see also Exhibit C29F).

[Dr.] Binney … consultatively examined [Chestang] in August of 2022. [She] complained of anxiety, brain fog, and depression (see page 3 of Exhibit C27F). [She] exhibited a positive attitude, good grooming and hygiene, appropriate attire, alertness, unremarkable speech, adequate mental flexibility, unremarkable processing speed, coherent and logical thoughts, adequate attention and concentration, adequate receptive language, adequate immediate and recent memory, adequate social skills, fair insight, adequate judgment, appropriate thought form and content, average intelligence, and goal-directed thoughts. She denied hallucinations, suicidal/homicidal ideations, and delusions. [She] did not possess any significant motor functioning problems (see pages 3-4 of Exhibit C27F).

11

Dr. … Christensen performed a consultative evaluation on [Chestang] in August of 2022. [She] alleged FM/pain exacerbated by activity, lupus, high blood pressure, back and neck problems, high cholesterol, and joint arthritis (see page 2 of Exhibit C28F). Dr. Christensen noted one of [her] daily activities included reading (see page 3 of Exhibit C28F). [She] demonstrated clear lungs, grossly intact neurological functions, a steady and unassisted gait, full muscle strength, intact sensations throughout, negative straight leg raises, intact reflexes, intact fine motor skills, and normal ranges of motions. [She] was able to open doors, button shirts, manipulate a coin, squat, rise from a seated position, get onto and off the exam table, walk on her heels and toes, do a tandem walk, and hop and stand on one foot. Dr. Christensen did not observe any signs of muscle spasms, or extremity clubbing/cyanosis/edema. [She] also possessed alertness, good eye contact, fluent speech, an appropriate mood, clear thought processes, normal memory, good concentration, and intact orientation. Dr. Christensen further reported [she] was able to read (see pages 3-10 of Exhibit C28F).

Tr. 17–19.

The ALJ found Dr. Higdon's opinion "somewhat persuasive." Tr. 19. The ALJ explained:

In March of 2020, Dr. … Higdon performed a consultative exam on [Chestang] and concluded [she] was able to lift/carry twenty pounds occasionally and ten pounds frequently, to sit/stand seven hours, and to walk two hours, with limitations in right hand reaching, in doing postural activities, and in exposure to environmental elements (see pages 11- 14 of Exhibit C7F). The undersigned finds Dr. Higdon's opinions are somewhat persuasive since they are somewhat supported by the Dr. Higdon's exam findings. [Chestang] exhibited full muscle and grip strength, intact sensations, negative straight leg raises, and normal ranges of motions. [She] was able to lift/carry/handle light objects, to perform fine motor skills rise from a seated position, to get onto and off the exam table, to walk on her heels and toes, to perform a tandem walk, and to hop and stand on one foot (see pages 3-5 of Exhibit C7F). The undersigned also finds Dr. Higdon's opinions are somewhat persuasive because they are somewhat consistent with the medical evidence. Dr. … Christensen performed a consultative evaluation on [Chestang] in August of 2022. [She] demonstrated clear lungs, grossly intact

12

neurological functions, a steady and unassisted gait, full muscle strength, intact sensations throughout, negative straight leg raises, intact reflexes, intact fine motor skills, and normal ranges of motions. [She] was able to open doors, button shirts, manipulate a coin, squat, rise from a seated position, get onto and off the exam table, walk on her heels and toes, do a tandem walk, and hop and stand on one foot (see pages 3-10 of Exhibit C28F).

Tr. 19.

The ALJ found opinions by Disability Determination Services (DDS) physicians "somewhat persuasive." Tr. 19. The ALJ explained:

In September of 2021 and in September of 2022, [DDS] physicians found [Chestang] had no severe mental impairment, and that [she] possessed no more than mild limitations in the four functional areas of the 'B' criteria. The DDS physicians also concluded [she] was able to perform light work, with limitations in climbing and crawling, and with restrictions in exposure to temperature extremes, vibration, pulmonary irritants, and hazards (Exhibits C3A and C6A). The undersigned finds the DDS opinions are somewhat persuasive since they are somewhat supported by the DDS review and report of the medical evidence. The DDS report indicated [Chestang] had cervical spine degenerative changes, lumbar spine degenerative changes, a cooperative attitude, an appropriate mood and affect, normal thought processes and content, normal judgment, and good insight (see pages 5-6 of Exhibit C3A). The undersigned also finds the DDS opinions are somewhat persuasive because they are somewhat consistent with the medical record. In March of 2019, a brain magnetic resonance imaging (MRI) scan demonstrated a cluster of micro-ischemic lesions of the left peri atrial white matter. A cervical spine MRI scan showed multi-level disc bulges with T2 lesions involving the anterior horns of the cervical C3-4 cord (see pages 32-36 of Exhibit C6F). Cervical spine x-rays revealed C5-6 and C6-7 degenerative changes (see page 41 of Exhibit C6F). During a consultative exam performed in August of 2022, [Chestang] exhibited alertness, unremarkable speech, coherent and logical thoughts, adequate attention and concentration, adequate receptive language, adequate immediate and recent memory, adequate social skills, fair insight, adequate judgment, appropriate thought form and content,

13

average intelligence, and goal-directed thoughts (see pages 3-4 of Exhibit C27F).

Tr. 19–20.

The ALJ found Dr. Binney's opinion "not persuasive." Tr. 20. The ALJ explained:

> [Dr.] Binney … consultatively examined [Chestang] in August of 2022, and opined [she] possessed mild to moderate limitations in engaging in activities of daily living, in performing vocationally, and in interacting personally (see page 5 of Exhibit C27F). The undersigned finds Dr. Binney's opinions are not persuasive since they are not supported by Dr. Binney's exam findings. [Chestang] exhibited a positive attitude, good grooming and hygiene, appropriate attire, alertness, unremarkable speech, adequate mental flexibility, unremarkable processing speed, coherent and logical thoughts, adequate attention and concentration, adequate receptive language, adequate immediate and recent memory, adequate social skills, fair insight, adequate judgment, appropriate thought form and content, average intelligence, and goal-directed thoughts (see pages 3-4 of Exhibit C27F). The undersigned also finds Dr. Binney's opinions are not persuasive because they are not consistent with the medical evidence. Dr. … Christensen performed a consultative evaluation on [Chestang] in August of 2022. [She] demonstrated alertness, good eye contact, fluent speech, an appropriate mood, clear thought processes, normal memory, good concentration, and intact orientation. It was further reported [she] was able to read (see pages 3-10 of Exhibit C28F).

Tr. 20.

The ALJ found Dr. Christensen's opinion "somewhat persuasive." Tr. 20. The ALJ explained:

> Dr. Christensen consultatively evaluated [Chestang] in August of 2022 and determined [she] had no significant physical functioning limitations (see page 7 of Exhibit C28F). The undersigned finds Dr. Christensen's opinion is somewhat persuasive since it is somewhat supported by Dr.

14

Christensen's examination results. [Chestang] demonstrated clear lungs, grossly intact neurological functions, a steady and unassisted gait, full muscle strength, intact sensations throughout, negative straight leg raises, intact reflexes, intact fine motor skills, and normal ranges of motions. [She] was able to open doors, button shirts, manipulate a coin, squat, rise from a seated position, get onto and off the exam table, walk on her heels and toes, do a tandem walk, and hop and stand on one foot (see pages 3-10 of Exhibit C28F). The undersigned also finds Dr. Christensen's opinion is somewhat persuasive because it is somewhat consistent with the medical evidence. During a consultative exam performed in August of 2022, [Chestang] did not possess any significant motor function problems (see page 4 of Exhibit C27F).

Tr. 20.

The ALJ summarized her RFC findings:

[T]he undersigned finds [Chestang] has the above [RFC] assessment, which is supported by [her] medical records and severe impairments, in addition to the opinions of DDS physicians. DDS physicians also found [she] was able to perform light work. The undersigned finds [she] is limited to doing light work and to standing/walking two hours, with postural limitations and with restrictions in exposure to hazards, due to the effects of [her] spinal disorders, connective tissue disorder/lupus, inflammatory arthritis, and FM.

[Chestang] testified she is able to do normal things, to perform light chores (albeit at a pace) even on a not-so-good day, and to cook small meals. In her adult function reports dated September of 2021and June of 2022, [she] noted she was able to care for the cat, dress herself (albeit a little slowly), bathe herself (while sitting or holding onto to something), feed herself, maintain her basic and daily grooming, use a computer, watch television daily, communicate with others, attend church, get along with others, finish what she starts occasionally, get along with authority figures, handle changes in routine okay, and/or count change. The undersigned notes [she] was adequately able to read, understand, and answer the questions in both adult function reports (Exhibits C4E and C11E).

[Chestang]'s exams showed [she] was essentially able to function physically and mentally. For example, in March of 2020, Dr. … Higdon

15

performed a consultative exam on [Chestang]. [She] exhibited full muscle and grip strength, intact sensations, negative straight leg raises, a steady and unassisted gait, and normal ranges of motions. [She] was able to lift/carry/handle light objects, to perform fine motor skills rise from a seated position, to get onto and off the exam table, to walk on her heels and toes, to perform a tandem walk, and to hop and stand on one foot (see pages 3-5 of Exhibit C7F). Dr. Higdon also observed [she] possessed alertness, good eye contact, fluent speech, clear thought processes, normal memory, good concentration, and an ability to perform more demanding tasks (see page 4 of Exhibit C7F).

Tr. 20–21.

At step four, the ALJ found Chestang had been able to perform her past relevant work as a customer service representative, hospital insurance representative, and secretary. Tr. 21–22. The ALJ therefore found Chestang had not been disabled during the period under consideration. Tr. 22.

## Standard of Review

A court's review of a decision by the Commissioner is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoted authority omitted). The substantial-evidence standard applies only to factual findings. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). "The Commissioner's failure to apply the correct law or

16

to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoted authority and alterations omitted).

## Law and Analysis

Chestang argues that the ALJ reversibly erred by failing to account for the "total limiting effects" of her impairments. *See* Doc. 10. She complains that the RFC includes no mental limitations despite evidence of mental impairments and her statements and testimony about pain, fatigue, and other symptoms. *Id.* at 2, 7–9.

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). To determine a claimant's RFC, an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]" *Id.* § 404.1545(e).

"Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone[.]" *Id.* For example, "someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with those of light work activity on a sustained basis." *Id.* "In assessing the total limiting effects of [a claimant's]

17

impairment(s) and any related symptoms, [an ALJ] will consider all of the medical and nonmedical evidence" as follows:

(1) General. When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work. In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you. We also consider the medical opinions ….

(2) Consideration of objective medical evidence. Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

(3) Consideration of other evidence. Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence

18

and other evidence, will be taken into account … in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons. … Factors relevant to your symptoms, such as pain, which we will consider include:

>    (i) Your daily activities;
>
>    (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
>    (iii) Precipitating and aggravating factors;
>
>    (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
>    (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
>    (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
>    (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(4) How we determine the extent to which symptoms, such as pain, affect your capacity to perform basic work activities. In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your

19

medical sources or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

*Id*. § 404.1529(c).

The finding that an impairment could reasonably be expected to produce the alleged symptoms does not involve a finding on the intensity, persistence, or functionally limiting effects of the symptoms. *Id*. § 404.1529(b). For that finding, an ALJ considers all available evidence, including medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. *Id*. § 404.1529(a), (c). The ALJ determines the extent to which the "alleged functional limitations and restrictions due to … symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how" the symptoms affect the ability to work. *Id*. § 404.1529(a).

"[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks, alteration, and quoted authority omitted). Still, an ALJ must clearly articulate explicit and adequate reasons for rejecting a claimant's testimony about symptoms. *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995). A court will not disturb a clearly articulated finding about the claimant's symptoms if

20

it is supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

Here, contrary to Chestang's argument, the ALJ considered the "total limiting effects" of Chestang's impairments. The ALJ considered Chestang's testimony about her symptoms but found the testimony was not entirely consistent with the medical and other evidence, including her daily activities, the state agency consultants' prior administrative medical findings, and objective medical evidence. *Compare* Tr. 40–49 (Chestang's testimony about her symptoms), *with* Tr. 16–21 (the ALJ's decision explaining inconsistencies between Chestang's testimony and reported daily activities, prior administrative findings, and objective medical evidence).

Chestang argues her subjective complaints are consistent with the evidence. Doc. 10 at 9–13 (citing Tr. 89, 350–51, 354–55, 377, 379, 390, 394–95, 400–01, 414, 431, 437, 466, 512–16, 536, 542, 547, 551, 558, 565, 578, 581, 585, 587, 593, 595, 598, 600, 603–04, 607–10, 613, 685–91, 693–95, 744–45, 848, 853, 860, 867, 896, 930, 950, 952, 954, 957, 1004–07, 1009–11, 1013–14, 1044). Much of the evidence she highlights consists of her subjective complaints reported to providers.[6] Besides that evidence, she highlights

_____

[6]Chestang highlights the following evidence consisting of her own subjective complaints to providers. She frequently reported sleep disturbances. Tr. 350, 355, 390, 395, 466, 536, 542, 547, 551, 558, 565, 578, 585, 593, 598, 848, 853, 860, 867, 930. She frequently reported fatigue. Tr. 351, 354, 394, 466, 613. She frequently reported anxiety, depression, fatigue, and widespread pain. Tr. 377, 379, 431, 603–04, 607–10, 685–87, 689–91, 693–95, 744–45, 823–25, 896. During the March 2020 consultative examination with Dr. Higdon, she reported sleeping poorly and having crying spells. Tr. 512. She stated she was taking medication for the poor sleep and crying spells and that she had received counseling in the past. Tr. 512. During a February 2022 visit with Dr. Patricia Jordan-Gonzalez, she reported increasing brain fog and fatigue. Tr. 954. During the

objective medical evidence supporting her complaints.[7] But under this Court's limited review, that the ALJ could have made different factual findings

August 2022 consultative examination with Dr. Binney, she reported having anxiety attacks and chronic pain; having symptoms of isolation/withdrawal, depressed mood, and less interest in doing activities; having stomach problems, muscle tension, numbness, and headaches; having brain fog and not being "as sharp and alert"; and having memory problems and difficulty articulating thoughts. Tr. 1004–05. She stated that her symptoms occurred more than half the time (her husband said that her anxiety occurs at least weekly); that medical problems and family issues triggered her anxiety; and that she could not work because of brain fog and chronic pain. Tr. 1005–06. During the August 2022 consultative examination with Dr. Christensen, she reported having stabbing pain, body aches, tenderness, memory loss, brain fog, numbness, and tingling. Tr. 1009. She stated that her ability to work is affected by brain fog and that "she is depressed due to pain and sometimes she wants to die because of pain." Tr. 1010. During that examination, a systems review was positive for weight gain, itching, headaches, cough, heartburn, muscle pain, joint swelling, muscular weakness, paresthesia, difficulties with memory, and emotional problems. Tr. 1011.

[7]Chestang highlights the following additional evidence. A brain MRI revealed patchy areas of peripheral frontal white mater and periatrial white matter bilaterally and a radiologist noted that "[t]hese lesions could represent remote ischemia or postinflammatory change." Tr. 437. Dr. Weisman diagnosed her with chronic pain syndrome. Tr. 581, 587, 595, 600. She had episodes of sinus tachycardia from chronic pain. Tr. 89. Her serology showed elevated inflammatory markers. Tr. 400, 401, 414. During the March 2020 consultative examination, Dr. Higdon observed that she displayed a flat affect and was slow to follow directions, requiring repetition; that she had palpable muscle spasms and tenderness in various joints; that she "appeared to have slow gait and had some slowness with following directions with some directions need to be repeated"; and that her treatment history, report of symptoms, flat affect, and need for instructions to be repeated supported that she has anxiety. Tr. 514–16. During a January 2022 visit, Dr. Jordan-Gonzalez wrote, "Fibromyalgia very symptomatic. Discussed with [Chestang] that Fibromyalgia is a diagnosis of widespread pain due to central sensitization of neurons. Treatment of FM is a multidisciplinary approach that requires all four goals of treatment to be managed to achieve improvement - pain, sleep, exercise, and treatment of depression/anxiety if present." Tr. 952. During a February 2022 examination, Dr. Jordan-Gonzalez noted she had multiple tender points (diffusely). Tr. 957. During the August 2022 consultative examination, Dr. Binney observed that she had had "significant difficulties giving specific information and dates" when answering questions; had worn sunglasses during the latter half of the evaluation because of the brightness of the lights; her behavior was remarkable for fidgeting and closing her eyes; her "current level of mental health symptoms would best be characterized as mild to moderate"; her expressive language appeared limited insofar as she exhibited word-

matters naught; what matters is that the ALJ's factual findings are supported by substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek*, 587 U.S. at 103 (quoted). As shown above, substantial evidence is present.

Chestang complains that the ALJ never mentioned that she suffered from fatigue or reported sleep disturbances to providers or that, in summarizing Dr. Christensen's evaluation, "she has a brain fog, she is depressed due to pain and sometimes wants to die because of pain." Doc. 10 at 14. Chestang further complains that the ALJ mentioned only benign findings from Dr. Binney's consultative examination and ignored abnormal findings "patently" supporting her testimony. *Id*. But the ALJ was not required to "refer to every piece of evidence in [her] decision," and while the decision did not include this specific evidence, her decision was not a "broad rejection" insufficient to enable the Court to conclude she considered Chestang's "medical condition as a whole." *See Dyer*, 395 F.3d at 1211.

---

finding difficulty and difficulty providing explanations; her remote memory appeared to be limited insofar as she was unable to recall specific details regarding past autobiographical events; and she had demonstrated limited mental computation insofar as she was unable to complete basic verbal arithmetic problems without errors. Tr. 1004–06. Dr. Binney concluded that she met the criteria for anxiety disorder and depressive disorder. Tr. 1007. Dr. Binney found her presentation valid and consistent with her reported conditions. Tr. 1007. Dr. Binney wrote, "The mental health symptoms based on report and clinical observations appear to be mildly to moderately impacting activities of daily living, vocational performance, and interpersonal interactions. Current prognosis for [] Chestang is guarded." Tr. 1007 During the August 2022 consultative examination, Dr. Christensen noted his belief that her emotional disturbances "significantly" contributed to her overall pain. Tr. 1014.

Chestang argues the ALJ failed to "build an accurate and logical bridge from the record to her conclusions, requiring remand." Doc. 10 at 16. Neither the regulations nor binding precedent use the term "logical bridge." Binding precedent requires an ALJ to "state with at least some measure of clarity the grounds for [the] decision." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoted authority omitted); *accord Sturdivant v. Soc. Sec. Admin., Comm'r*, No. 22-13952, 2023 WL 3526609, at *4 (11th Cir. May 18, 2023) ("Sturdivant argues that the ALJ was required to link evidence to the RFC findings, but our case law only requires that the ALJ state with clarity [her] reasons for [her] decision."). As shown by the quotations from the decision, the ALJ addressed the evidence and explained how she determined the RFC.

Chestang argues the ALJ erroneously considered her daily activities by focusing on activities reflecting physical abilities and activities not showing an "ability to work on a sustained, full-time basis." Doc. 10 at 15. To the contrary, the ALJ considered daily activities reflecting on both mental and physical abilities, including in her discussion of the "paragraph B" areas of concentrating, persisting, or maintaining pace and in adapting or managing herself. Tr. 13–14. In any event, the ALJ properly evaluated Chestang's subjective complaints about her mental and physical symptoms by considering daily activities, whether physical or mental. As the Commissioner observes, "The ALJ considered [Chestang]'s daily activities to show that her subjective complaints were not consistent with the record, not to suggest each activity equated to the requirements of fulltime work. And an ALJ need not cite daily

activities of the same exertion of fulltime work or performed every day to discount subjective complaints or to support the RFC." Doc. 13 at 12.

Chestang relies on *Martz v. Commissioner, Social Security Administration*, 649 F. App'x 948 (11th Cir. 2016), in which the Eleventh Circuit held the ALJ improperly relied on daily activities that were not inconsistent with the claimant's particular subjective complaints. Doc. 10 at 15 n.15. *Martz* does not help Chestang. Unlike the ALJ in *Martz*, the ALJ here relied on daily activities inconsistent with Chestang's complaints.

Chestang argues that the vocational expert's testimony does not support the ALJ's finding at step four that Chestang can perform her past relevant work as a customer service representative, hospital insurance representative, and secretary, emphasizing testimony that Chestang could not perform that work if she had a different RFC. *Id*. at 7–9. As the Commissioner observes, this "discussion is misplaced." Doc. 13 at 12. The vocational expert testified in response to hypotheticals that mirrored the ALJ's RFC finding, *see* Tr. 50–51, and therefore included the impairments the ALJ deemed supported by the record, *see Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) ("In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004) (An ALJ is "not required to include findings in the hypothetical that [she] had properly rejected as unsupported."). The vocational expert's testimony employing the RFC finding supports the ALJ's step-four finding.

25

Chestang argues that a finding of "mild" ratings in the "paragraph B" areas requires mental limitations in the RFC. Doc. 10 at 16–17. To the contrary, no such requirement exists because the ratings are not an RFC assessment. *See supra* n.4, ; *see also Garcia v. Comm'r, Soc. Sec. Admin.*, No. 23-11184, 2023 WL 7404856, at *5 (11th Cir. Nov. 9, 2023) ("Contrary to Garcia's argument, the ALJ was not required to incorporate Garcia's mental impairments that he determined at step two in the rest of his RFC assessment because he found any impairments to be only mild, not moderate."). In a previous case involving Chestang, this Court rejected the same argument. *See* Doc. 29 at 18–19, in *Chestang v. Comm. of Soc. Sec.*, No. 8:21-cv-482-MRM. The reasoning remains persuasive:

> Here, the Court is not persuaded that the ALJ erred by failing to include mental limitations in the RFC.

> At step two of the sequential evaluation, the ALJ found that [Chestang]'s medically determinable mental impairments of anxiety and depression were non-severe as they "do not cause more than minimal limitation in [her] ability to perform basic mental work activities." In reaching this conclusion, the ALJ found "mild" limitations in three of the four paragraph B criteria … Despite finding mild limitations at step two, the ALJ included no mental limitations in the RFC.

> [Chestang] argues that the failure to include mental functional limitations in the RFC constituted error because the "mild" limitations in the paragraph B criteria required the ALJ to include mental limitations in the RFC. The Court disagrees. Rather, it appears that [Chestang] conflates (1) limitations in the paragraph B criteria, *see* 20 C.F.R. § 404.1520a, with (2) limitations in a claimant's RFC, *see* 20 C.F.R. § 404.1545. The limitations in the paragraph B criteria help the ALJ determine the severity of a claimant's mental impairments or whether a claimant meets a listing, while limitations in the RFC help the ALJ determine the level of work that a claimant can perform. *Compare* 20 C.F.R. § 404.1520a, *with* 20 C.F.R. § 404.1545. [Chestang]

26

> has provided no authority suggesting that the two are the same or that
> an ALJ must include mental limitations in the RFC on finding "mild"
> limitations in the paragraph B criteria.
>
> To the contrary, the persuasive precedent demonstrates that ALJs are
> not obligated to include mental limitations in the RFC even when they
> find "mild" limitations while completing a PRTF. *See Williams v. Soc.
> Sec. Admin.*, 661 F. App'x 977, 979-80 (11th Cir. 2016) (finding that the
> ALJ did not err by failing to include limitations in the RFC related to
> the plaintiff's non-severe mental impairment when the ALJ found that
> the plaintiff had only "mild" limitations in the paragraph B criteria)[.]

*Id.*

The ALJ explained that the RFC reflected the "paragraph B" findings. Tr. 14. The ALJ explained that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" Tr. 16. Thus, the ALJ considered Chestang's severe and non-severe impairments in assessing the RFC.

Chestang relies on *Groettum v. Commissioner of Social Security*, No. 2:17-cv-611-CM-JES, 2019 WL 488260 (M.D. Fla. Jan. 7, 2019). Doc. 10 at 16–17. In *Groettum*, the Court explained, "Because the ALJ failed to discuss Plaintiff's mental impairments in his RFC determination or expressly indicate that the medical evidence suggested Plaintiff's ability to work was unaffected by his mild limitations, the Court cannot determine whether the ALJ's RFC determination adequately encompasses Plaintiff's mental impairments." *Groettum v. Comm'r of Soc. Sec.*, No. 2:17-cv-611-CM-JES, 2019 WL 488260, at *11 (M.D. Fla. Jan. 7, 2019) (internal quotation marks and alteration omitted). *Groettum* does not help Chestang. Unlike the decision in *Groettum*,

27

the decision here, read as a whole, shows the ALJ's consideration of Chestang's mental impairments and the reasons why the ALJ included no mental limitations in the RFC.

To the extent Chestang argues that the ALJ did not properly find her mental impairments non-severe at step two, she forfeits the argument because she fails to develop it, providing no analysis or citations to the record or authority. *See* Doc. 10 at 13. In any event, the ALJ found other severe impairments at step two and therefore moved to step three, making harmless any error in failing to find any mental impairment severe.

## Recommendation

The undersigned recommends **affirming** the Commissioner's decision and **directing** the clerk to (1) enter judgment in favor of the Commissioner and against Chestang and (2) close the file.

## Objections and Responses

"Within 14 days after being served with a copy of [a] recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A [district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). "A party failing to

28

object to … findings or recommendations … in a report and recommendation … waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions[.]" 11th Cir. R. 3-1.

      **Entered** in Jacksonville, Florida, on July 31, 2024.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

29